# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2388-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.S.,[1]

     Defendant-Appellant,

and

A.H.,[2]

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.A.R.H.,

     a Minor.

_____

[1] We use initials and pseudonyms to protect the parties' privacy. R. 1:38-3(d)(12).

[2] A.H. is the biological mother of S.A.R.H. A.H.'s parental rights were terminated upon the entry of a judgment of guardianship after default and a proof hearing conducted on January 11, 2018. A.H. is not participating in this appeal.

_____

Argued December 19, 2018 – Decided January 17, 2019

Before Judges Ostrer, Currier, and Mayer.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0043-17.

Catherine F. Reid, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Catherine F. Reid, on the briefs).

Michelle D. Perry-Thompson, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Michelle D. Perry-Thompson, on the brief).

Damen J. Thiel, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Damen J. Thiel, on the brief).

PER CURIAM

Defendant S.S. appeals from a January 11, 2018 order terminating his parental rights to his daughter, S.A.R.H. (Sara), born in June 2016. We affirm.

Just after Sara's birth, hospital staff contacted the Division of Child Protection and Permanency (Division) with concerns regarding the mental health of the child's mother, A.H., and her ability to care for Sara. The Division

conducted an investigation and executed an emergency removal of Sara three days after her birth. Sara was placed with resource parents who she remains with today.

Defendant was not present for Sara's birth because he was incarcerated in May 2016. Shortly before Sara's birth, defendant was charged with distributing controlled substances, receiving stolen property, resisting arrest, and possessing a weapon for an unlawful purpose. When defendant was charged with these crimes, he was aware of Sara's imminent birth.

To avoid a prison term and attend the birth of his child, defendant entered into a plea in which he agreed to attend a drug treatment program. If he violated the terms of the plea agreement, defendant understood he would be incarcerated. Five days after entering the drug treatment facility, defendant was caught smoking marijuana and discharged from the program. Based on his violation of the plea agreement, defendant was sentenced to serve three years in prison.[3]

On July 12, 2016, a Division case worker met with defendant at the county jail and explained Sara had been removed from her mother and was living with

---

[3] During oral argument, defendant's counsel advised the panel that defendant was released from prison in June 2018. In October 2018, defendant was charged with three new crimes. The new charges remain pending as of December 2018.

a resource family. Defendant expressed a desire to have custody of Sara and asked the case worker for a picture of the child.

The case worker also contacted defendant's probation officer. The probation officer discussed defendant's gang-related activities and past criminal history. The probation officer confirmed defendant was discharged from the drug treatment facility for smoking marijuana and engaging in inappropriate behavior. The probation officer informed the case worker that defendant had mental health issues.

After the meeting in July 2016, the Division was unable to contact defendant again until August 2017. Although it attempted to contact defendant, he transferred between prison facilities frequently, making it difficult for the Division to meet with him.

The Division proceeded with the custody litigation. In September 2016, the family court issued an order continuing the Division's custody of Sara and scheduling a fact-finding hearing. Defendant was not present at this conference, but was represented by counsel. In October 2016, the court held a hearing attended by defendant's counsel and determined Sara should remain in the Division's custody.

A-2388-17T4

On January 30, 2017, the court conducted a permanency hearing, at which the Division presented a plan to terminate the parents' rights. The maternal grandmother was asked where A.H. lived and whether A.H. sought custody of Sara. Counsel for defendant was present at this hearing, but defendant himself was not. No testimony regarding termination of defendant's parental rights was taken during this hearing. Defendant contends the Division misadvised the judge during this hearing regarding the length of his incarceration. Defendant asserts if he had been present in court that day, he would have corrected the record as to the length of his incarceration.

The next permanency hearing occurred on April 10, 2017. Neither defendant nor his attorney were in court on this date. The Division resubmitted its permanency plan because the time limit for completing the plan was about to expire.

Additional permanency hearings occurred on May 30 and 31, 2017. Defendant and his counsel were not in court on these dates. No fact-findings were presented to the court. The hearing merely resulted in the resubmission and reapproval of the Division's prior permanency plan.

On August 29, 2017, the court held a hearing to determine the steps needed to complete the guardianship litigation. The Division met with defendant that

day to discuss the guardianship proceeding and served him with the guardianship complaint. Defendant was present at this hearing, but was not represented by counsel. The judge ordered the Division to continue custody of Sara. In addition, the judge ordered defendant to undergo a psychological evaluation and sign a release allowing the Division to review any services completed while incarcerated.

On September 26, 2017, the court held a final conference before the guardianship trial. Defendant and his counsel participated in this conference. The Division reaffirmed its commitment to terminate defendant's parental rights and reported that defendant's psychological and bonding evaluations were scheduled. The judge scheduled the guardianship trial for December 2017.

When the evaluations were completed, the judge commenced the guardianship trial. The testifying witnesses included the Division's expert, Dr. Ronald S. Gruen, a Division case worker, and defendant.

Dr. Gruen testified defendant understood the situation related to custody of Sara. Defendant admitted to Dr. Gruen it would be difficult for Sara if she were removed from her resource parents.

Based on his interview with defendant, Dr. Gruen provided background information about defendant's childhood. Defendant explained to the doctor he

A-2388-17T4

was left alone frequently as a child because his mother worked and his father had substance abuse problems. Defendant told Dr. Gruen he received Supplemental Security Income (SSI) as a child because he was diagnosed with depression and paranoia. As of the date of his evaluation, defendant was taking medication for depression and anxiety. Based on defendant's personal history, including his juvenile detentions and criminal activities, Dr. Gruen concluded defendant was not deterred from criminal activity and "lived a lifestyle of acting out, [and] irresponsible behavior."

Dr. Gruen diagnosed defendant with a personality disorder and substance abuse issues. The doctor testified these disorders reduced defendant's ability to improve his lifestyle and care for his daughter. According to Dr. Gruen, individuals with a dual diagnosis may succeed over a short time period, but were likely to fail over the long term because such patients are unable to overcome their issues, grow desperate, and ultimately return to criminal life.

Dr. Gruen concluded defendant presented with "[p]ersonality [d]isorder with [n]arcissistic and [d]epressive traits[,]" struggles with interpersonal relationships, has low self-esteem, and his "feelings of failure may lead to suicidal ideation." Based on these findings, Dr. Gruen advised against removing

A-2388-17T4

Sara from her resource parents. Dr. Gruen explained defendant was not in a position to care for Sara without significant rehabilitation and parenting classes.

Dr. Gruen also explained defendant required extensive treatment for his mental health issues. According to the doctor, defendant had to complete substance abuse treatment and engage in individual therapy prior to caring for Sara. Dr. Gruen testified defendant required at least one year of intense treatment after his release from prison. Based on that timetable, Dr. Gruen opined removal of Sara from her resource parents would have a significant negative impact on the child.

Dr. Gruen testified no bond existed between Sara and defendant. Sara was fifteen months old at the time of the bonding evaluation. Despite defendant's best efforts to sooth Sara, she cried throughout the bonding evaluation. Defendant attempted to calm Sara and told Dr. Gruen "[i]t hurt[ ] to see her cry." Based on the bonding evaluation, Dr. Gruen expressed no harm would come to Sara if her relationship with defendant was severed.

Dr. Gruen also conducted a bonding evaluation between Sara and her resource parents. The evaluation revealed a secure bond between Sara and her resource parents. The resource parents expressed their love for Sara and intention to adopt Sara at the conclusion of the litigation. Dr. Gruen testified

A-2388-17T4

Sara had a high level of comfort and trust with her resource parents. He opined there would be significant emotional harm if Sara were removed from her resource parents, and defendant would not be able to ameliorate the harm if he gained custody.

The Division's case worker testified regarding the Division's efforts to meet with defendant. According to the case worker, the Division only met with defendant twice over a thirteen-month period because he moved frequently between prison facilities. When the Division eventually contacted defendant, he offered his mother, his brother, and his sister as potential placements for Sara. He also told the Division about services offered in prison, but explained he could not participate in the services due to a long waiting list.[4]

The Division's case worker testified there was no contact or communication between defendant and his daughter while defendant was in prison. The case worker told the judge that defendant never asked the Division to deliver letters he may have written to Sara or if he could meet Sara while he was incarcerated.

---

[4] Other than defendant's own testimony regarding the availability of services in prison, there was no other evidence supporting his claim.

The case worker also explained the Division's efforts to investigate placement of Sara with defendant's relatives. The Division ruled out the paternal grandmother and defendant's brother because they had criminal histories and could not be certified as resource parents. Defendant's sister declined to care for Sara.

In explaining the relationship between Sara and her resource parents, the case worker testified the child was thriving in their care and wished to adopt her.

Defendant also testified during the guardianship trial. Defendant told the court he expected to be released from prison in June 2018 and described his plan post release. Defendant explained he would live with a family member or friend until he saved enough money for his own residence. Defendant stated he would apply for a job at Dunkin' Donuts upon his release.[5] Defendant admitted he never had a steady job.

Defendant also told the judge about the services he completed while in prison. Defendant completed a group therapy program focused on anger management and substance abuse. Defendant also acknowledged it would take time for him to learn to parent his daughter after he was released from prison.

---

[5] Defendant's brother worked at Dunkin' Donuts. Defendant conceded he did not have a job offer from Dunkin' Donuts.

A-2388-17T4

In addition, defendant advised he was in isolation while in prison due to his involvement in several prison fights. Defendant claimed being in isolation made it difficult for him to receive services.

The judge rendered an oral decision based on the testimony and evidence. The judge concluded the Division satisfied its burden of proof under each of the prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence and terminated defendant's parental rights.

The judge found defendant was incarcerated due to his failure to complete the drug treatment program as part of his plea agreement, and Sara suffered as a result. The judge emphasized defendant's inability while in prison to partake in "services to put him in a position to provide parenting" to Sara had also caused her harm. The judge highlighted defendant's lack of housing, lack of a definite job upon release from prison, and absence of a stable support system would cause harm to Sara, and defendant could not ameliorate that harm.

The judge also relied on Dr. Gruen's testimony, which he found credible. Based on that testimony, the judge concluded defendant required at least one year of services after his release from prison to be able to parent Sara. The judge believed permanency was the most important issue for Sara, and the absence of a concrete plan for permanency would harm the child. While the judge

11

acknowledged defendant tried to improve himself and his circumstances, defendant required significant services, including mental health and drug counseling, to care for Sara. According to the judge's findings, the time needed for defendant to be able to parent his child would only add to Sara's harm.

The judge also reviewed Sara's placement. The judge concluded the Division made reasonable efforts to investigate placing Sara with relatives, but those family members were ruled out for valid reasons. He noted Sara's resource parents cared for her since she was three days old and wanted to adopt her.

The judge further concluded the Division was limited in the services it could provide to defendant due to his incarceration. The judge found the Division did what it could considering defendant's placement in isolation while in prison.

The judge determined there was no bond between Sara and defendant, and no harm would come to Sara if the relationship with defendant was severed. On the other hand, the judge found severe harm would occur if the relationship between Sara and her resource parents were severed. The judge concluded defendant would be unable to ameliorate the harm from severing Sara's relationship with her resource parents.

A-2388-17T4

On appeal, defendant argues the judge erred in terminating his parental rights because: (1) the Division failed to provide him with due process after taking custody of Sara; and (2) the Division failed to prove all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence.

A parent has a fundamental constitutional right "to enjoy a relationship with his or her child." In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Courts "have consistently imposed strict standards for the termination of parental rights." Id., at 347. However, the "constitutional protection surrounding family rights is tempered by the State's parens patriae responsibility to protect the welfare of children." Ibid. A parent's interest must yield to the State's interest in protecting children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009).

When terminating parental rights, the court must consider the "best interests of the child." K.H.O., 161 N.J. at 347. Termination of parental rights may only be granted if the requirements set forth in N.J.S.A. 30:4C-15.1(a), also known as the best interests standard, are established by clear and convincing evidence:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348. "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "The general rule is that findings by the trial court are binding on appeal when supported by

adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411–12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).  Moreover, "[b]ecause of the family courts' special jurisdiction and expertise in family matters," we accord even greater deference to the judge's fact finding.  N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (alteration in original) (quoting Cesare, 154 N.J. at 413).  Unless the trial judge's factual findings are "so wide of the mark that a mistake must have been made[,]" they should not be disturbed, even if the reviewing court would not have made the same decision.  N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

When determining whether parental rights of an incarcerated defendant should be terminated, the court must evaluate the impact of defendant's incarceration as to each prong of N.J.S.A. 30:4C-15.1(a).  See N.J. Div. of Child Prot. & Permanency v. P.D., 452 N.J. Super. 98, 119 (App. Div. 2017) (quoting In re Guardianship of K.L.F., 129 N.J. 32, 38 (1992)).

When dealing with a parent whose incarceration is concurrent with a child's placement, the Division is "impeded by 'the difficulty and likely futility of providing services to a person in custody[.]'"  N.J. Div. of Youth & Family

Servs. v. T.S., 417 N.J. Super 228, 242 (App. Div. 2010) (alteration in original) (quoting N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007)). The Division is required to explore services that are feasible and appropriate for an incarcerated parent and make an effort to provide such services. See N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 557–58 (2014).

The failure to produce an incarcerated defendant for hearings is also analyzed under N.J.S.A. 30:4C-15.1(a). See N.J. Div. of Youth & Family Servs. v. L.M., 430 N.J. Super. 428, 445–46 (App. Div. 2013). In L.M., we reversed termination of the defendant's parental rights because the Division and the family court failed to produce the defendant for "critical stages" of the litigation. Id. at 448–49. If the right to protect a parent's constitutional entitlement is to be effective, "then the right must exist not only at the trial itself but at all critical stages after formal proceedings have begun." Id. at 448. The Division and the family court should make every effort to ensure an incarcerated parent is produced, either in court or electronically, for all critical proceedings concerning the best interests of the child.[6]

---

[6] During oral argument, the Division's attorney explained defendant, at some point during the litigation, expressed he did not want to be transported to court

While defendant was not present at some hearings, he was represented at hearings where critical information and testimony were presented to the judge. At the hearings at which defendant and his counsel were neither present nor represented, the judge engaged in the purely ministerial task of reapproving the Division's original permanency plan or conducted proceedings during which no testimony was taken. Based on our review of the record, defendant was present and represented during the "critical stages" of the litigation, and was not deprived of due process.

Similarly, we reject defendant's contention the Division failed to make reasonable efforts to place Sara with relatives. Family reunification includes the long-standing policy to place children with relatives when possible. N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 619 (App. Div. 2007). However, there is no presumption of placement with a family member over a non-family member. Ibid. The Division explored potential relatives who might care for Sara, and all were ruled out by the Division because of their own criminal histories or declining to care for the child.

---

proceedings because the ride to the courthouse was long and uncomfortable. Based on defendant's statement, he appeared telephonically at subsequent court proceedings.

A-2388-17T4

Nor was it improper for the judge to consider the testimony of the Division's expert and case worker regarding the resource parents' desire to adopt Sara. The Division may submit reports by staff personnel "prepared from their own first-hand knowledge of the case, at a time reasonably contemporaneous with the facts they relate, and in the usual course of their duties with the [Division]." A.W., 103 N.J. at 595 n.1 (quoting In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969)). Reports by qualified Division personnel "charged with the responsibility for overseeing the welfare of children in the State, supply a reasonably high degree of reliability as to the accuracy of the facts contained therein." Ibid. (quoting Cope, 106 N.J. Super. at 344). The information regarding the intention of the resource parents to adopt Sara was not inadmissible hearsay. The reports were based on first-hand knowledge, contemporaneous with discussions with the resource parents, and part of the Division's usual duties.

Having reviewed the record, we are satisfied the judge conducted the requisite analysis of the statutory factors and there is sufficient credible evidence supporting the judge's findings as to each of the four prongs of the best interests test. We discern no basis to reverse the order terminating defendant's parental rights.

18

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2388-17T4